HENRY L. BRACK AND WIFE

*vs.*

THE MAYOR, ETC., OF BALTIMORE.

*Condemnation of land: subject to a right of way; condemnation
for reservoir purposes.   Height of dam and water: land
to be flooded.   Value of land: availability
for special purpose.*

Condemnation proceedings were instituted by the Mayor and
City Council of Baltimore to acquire land for a reservoir; the
land taken divided a farm in two, and left one part of it with-
out any approach from the public road; the City had reserved
to the landowner, across the land to be condemned and flooded,
a right of way, by a bridge and road along the line of the pre-
viously existing road; the City was not required by the inquisi-
tion to build the bridge and road, but by the prayers their value
was to be considered by the jury and allowed for in their ver-
dict, together with other damages for the land condemned:
*Held,* that such a method of condemnation was not unconstitu-
tional.                                                  p. 435

Under the provisions of the Code, Article 33A, as adopted by
Chapter 117 of the Acts of 1912 and amended by Chapter 463
of the Acts of 1914, there was nothing to prevent the City from
taking less than a fee simple title to the land to be condemned.
                                                        p. 435

In condemnation proceedings to assess damages for injury to
land to be flooded to form a reservoir, evidence of what would
be the injury if the height of the dam should ever be raised
over and above that provided for and mentioned in the petition
under which the condemnation was sought, is inadmissible.
                                                        p. 436

In condemnation proceedings the question is not what the property might be worth at some distant day in the future, but what it is worth at the time of the taking, having consideration of everything properly entering into its then present value, including its availability for the special purpose for which it is to be used and the probability of its being so used within such time as gives additional value to it when sought to be con-demned.                                                      p. 438

*Decided April 5th, 1916.*

Appeal from the Circuit Court for Baltimore County. (McLane, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Pattison, Urner, Stockbridge and Constable, JJ.

*Alfred S. Niles* and *Carlyle Barton* (with whom were *William J. Ogden* and *Chester F. Morrow* on the brief), for the appellant.

*S. S. Field, City Solicitor of Baltimore City,* (with whom was *E. J. Colgan, Jr., Assistant City Solicitor,* on the brief), for the appellee.

Boyd, C. J., delivered the opinion of the Court.

This is the second appeal in proceedings instituted by the Mayor and City Council of Baltimore in the Circuit Court for Baltimore County to condemn certain lands of Henry L. Brack in connection with its water system in the valley of the Gunpowder River, in Baltimore County. Mr. Brack and Emma Brack, his wife, were made defendants. The jury found by their inquisition that it was necessary for the peti-tioner to acquire the land and premises described in the amended petition, for the purposes therein specified, and fixed

the damages at $7,500.00, upon the payment of which "the title to said tract of land described in said amended petition shall be and become vested in the said Mayor and City Council of Baltimore in fee, subject to the right of way mentioned in the petition filed in these proceedings."

The appellants rely on (1) their demurrer to the amended petition, which was overruled by the Court, and on (2) the exceptions to the rulings of the Court on the evidence. All of eight prayers offered by the City and four offered by the appellants were conceded, and hence no questions arise as to them.

First. The demurrer to the amended petition was on the ground that the condemnation of the property mentioned in said proceedings in the manner set forth in the third and fourth paragraphs of said petition will not give the Mayor and City Council of Baltimore the title to said property required by the terms of the Act of 1908, Chapter 214. The amended petition asked for the condemnation of 22.15 acres of land described in it in fee simple, subject to a reservation in perpetuity to the defendants, their heirs, assigns, or owners of the farm of the defendants shown on the plat annexed to the petition, or any portion thereof, to a right of way for ingress and egress for all purposes of a roadway over the said 22.15 acres and across Peterson's Run, substantially following the same location as the present roadway shown on the plat.

It is contended that the City could only acquire a fee simple title to the property thus condemned and could not have the right of way reserved over the property. The theory of the appellants is that by condemning this tract in fee simple the portion of the farm on which the improvements are located would be cut off from the public road and rendered useless, and that the reservation of the right of way was calculated to prevent the real situation from becoming apparent to the jury, which resulted in inadequate compensation being allowed.

As is shown by the opinion in *Brack* v. *Mayor, etc., of Baltimore,* 125 Md. 378, the farm of Mr. Brack, in which Mrs. Brack is only interested as his wife, consists of 190 acres. The property taken lies along a stream called Peterson's Run. The tract condemned in the first proceeding contained 44 acres, but after that case was remanded the petition was amended so that the land to be taken was reduced to 22.15 acres, which include 14.5 acres, which will be permanently flooded, and the additional acreage which may be occasionally flooded in periods of high water. The land proposed to be taken will divide the remainder into two disconnected tracts. The buildings are located on the part of the farm on the easterly side of Peterson's Run, and there is a roadway which leads to a public thoroughfare west of the farm. There is a bridge over the Run not far from the point where the stream enters the farm, which is a part of the roadway. The City has constructed a dam across the Gunpowder River, into which river Peterson's Run empties, below the property of the appellants, to an elevation of 188 feet above mean tide and it is its purpose to erect on the dam flash-boards to an elevation of four feet, thus making the dam with the flash-boards 192 feet above mean tide, which will interfere with the use of the road and bridge now there at their present level. In the former appeal the property was condemned "subject to the obligation upon the part of the Mayor and City Council of Baltimore to construct a suitable bridge over Peterson's Run, and a suitable road from each side of the bridge to the outlines of the property sought to be condemned, along the line of the present way," etc. JUDGE URNER, who delivered the opinion in that case, after referring to *P. R. R. Co.* v. *Reichert,* 58 Md. 261, and *Russell* v. *Zimmerman,* 121 Md. 339, as well as a number of authorities outside of this State, said: "In a case like the present, where part of the farm on which the buildings are located is apparently dependent for an outlet upon the roadway over the portion of the land which is being condemned, it seems entirely reasonable that the way should be preserved,

if possible, in order to promote the convenience of the landowner and to reduce the extent of the consequential injury to the property. But as the defendant is objecting to the provisions which seek to accomplish that result, and as he is entitled to assume such a position by virtue of the rule stated in the decisions of this and other Courts, we are unable to sustain the inquisition in its present form. Upon the remanding of the case it may be practicable to restrict the interest or area to be acquired, or modify the terms of the condemnation, so as to avoid the difficulty now presented. The brief of the appellee suggests that the objection could be obviated, and there is ample authority to permit an amendment for that purpose. Code, Art. 33A, sec. 4."

In the proceeding now before us evidence was offered by both parties as to the cost of a bridge and embankment, and as the jury were unquestionably authorized to consider those costs in awarding the damages, they presumably did so. We see no valid reason why a reservation of the right of way over the land condemned should not be allowed, as was done. A bridge and roadway were already there and as they would be rendered useless, or practically so, by reason of the increased height of the water, it was proper that the owner should be paid for them, and we do not understand why the City should not be permitted to condemn the property subject to the right of way. Such right of way will not interfere with its use of the property for the purposes intended, and it would be not only unreasonable, but useless to require the City to take the entire part of the farm on the easterly side of the run. If it had attempted to do so, it might well have been met with the objection that it was not necessary.

The owner is not required to build a new bridge and embankment, but he will get the money allowed by the jury to do with it as he sees proper. The prayers which were conceded, told the jury what damages they could allow, and there is no reason why the jury should have failed to understand the situation precisely as it existed. In this proceeding the City is not obligated to build the bridge and road,

but the owner is paid in money for them and the right of
way is reserved.   The Legislature can not be supposed to
have intended to prohibit the City from condemning prop-
erty so situated subject to a reservation of a right of way in
the place of the roadway already existing.   Although section
1 of Chapter 214 of the Acts of 1908 provided that property
acquired for certain purposes named in that Act should be
in fee, the new Article of the Code on *Eminent Domain,*
33A, as adopted by Chapter 117 of the Acts of 1912, and
subsequently amended by Chapter 463 of the Acts of 1914,
expressly provided that the State and any municipal or other
corporation, etc., which has the right to acquire property by
condemnation, shall acquire it, if condemnation proceedings
be resorted to, "in pursuance of, and under the provisions of
this Article, anything in any other Public General Law or
Public Local Law, or private or special statute to the con-
trary notwithstanding," except in proceedings for the open-
ing, closing, etc., of highways.   Then section 12 of Article
33A provides that, "The title so acquired in any condemna-
tion proceeding under this Article shall be an absolute or fee
simple title, and shall include and be all the right, title and
interest of each and all the parties to the proceedings, whose
property has been so condemned, *unless otherwise specified in
the judgment of condemnation."*   That is practically the
same as it was in section 5 of the Act of 1912, and the pro-
ceeding to condemn the appellant's property was begun after
that Act went into effect—the amended petition having been
filed after the Act of 1914 was passed.   There is, therefore,
nothing in the statute which prevents the City from taking
less than a fee simple title, if it be conceded that this reserva-
tion of the roadway had the effect of reducing or qualifying
the fee.   The demurrer was properly overruled.

Second.   This brings us to the exceptions taken.   Ezra B.
Whitman having testified as to the necessity for the taking
of the property sought to be condemned, its physical condi-
tion and other matters, on cross-examination, after saying
that the dam was 188 feet high, and that flash-boards will

raise it four feet, he was asked: "It· would be perfectly possible to have flash-boards that would raise it six feet, wouldn't it?", and replied, "That is possible, yes." He was then asked: "If you had flash-boards, if the City would sometimes take a notion to put flash-boards six feet high there, they could do it?" That was objected to and the objection was sustained—the Court saying: "It is manifest to the jury if you put a flash-board six feet or eight feet high, or ten feet high, that you will back the water up that much higher, and encroach more and more on Mr. Brack's land than you do in this proceeding. That is simply another proceeding of Mr. Brack's for damages. We are not trying that case." The appellant excepted to that action, which constitutes the first bill of exceptions. The learned judge below correctly sustained the objection to the question. The amended petition shows that it was the purpose of the City to raise the dam by flash-boards to an elevation of four feet, thus making it 192 feet above mean tide, and the jury by the inquisition found that it was "necessary for the petitioner to acquire said lands and premises, and that the damages to be sustained, by the said Henry L. Brack and Emma Brack, his wife, by the taking of said land described in the amended petition for the purposes therein specified, at the sum of $7,500.00." Inasmuch as the extent of the flooding of the appellants' land must necessarily depend upon the height of the dam, and as the petition in terms stated the purpose, namely to raise the dam to 192 feet by flash-boards, there can be no doubt that the City by this condemnation is limited to the 192 feet, at least it would not be justified in raising the same beyond that height if it affects any land or rights of the appellants not taken by this condemnation, unless, of course, it acquires the right to do so in some other way than by this porceeding.

Third. The other three exceptions can be considered together. The testimony of Robert B. Morse, which had been admitted· subject to exception, was stricken out and that ruling constituted the second bill of exceptions. The defend-

ants then offered the testimony of Mr. Morse in conjunction with that of William P. Cole, which was set out in a written proffer. The Court sustained the objection to that, which ruling is embraced in the third bill of exceptions. They then offered to prove by Alfred M. Quick substantially the same facts testified to by Robert B. Morse, and to prove by William P. Cole, in connection with the testimony of said Quick, the facts set out in the previous proffer. The Court sustained an objection to that, and that ruling constitutes the fourth bill of exceptions.

As the evidence of Mr. Morse occupies twelve pages of the printed record we will not attempt to give it in full. As stated in the record, he is a sanitary and civil engineer, who has made a specialty of water supply and sewerage work. The object in producing him was to prove some special, independent value of this property as a reservoir site. Several reasons may be given in support of the action of the Court in excluding the testimony. In the first place, we might well use the proffer itself set out in the third bill of exceptions. They offered to prove by Mr. Cole that, assuming the testimony of Mr. Morse to be true, the property's "value to any person or corporation acquiring it for the purpose of storing water would be reflected in its market value, that up to the present time the market value of said property has not reflected the value of the property as a reservoir site, because the facts testified to by the witness Morse were not known, but as soon as the facts so testified to should become known the said market value of the property, if it were not acquired by the City, would be greatly increased." It is not necessary to refer to any authority other than the opinion in the former case between these parties to show that, "With respect to the property taken the award must be based upon its actual market value *at the time of the condemnation,*" 125 Md. 381, yet this proffer shows in effect that up to that time the property had no market value as a reservoir site. It is perfectly true that in considering the availability of property for special purposes it is not necessary that it be in actual

use for such purpose at the time of the condemnation, but there must at least be some probability that it may be used within a reasonable time. It is not what the property might be worth at some distant day in the future, but what it is worth now—taking into consideration everything properly entering into its present value, including its availability for the special purposes for which it is claimed it may be used, and the probability of its being so used within such time as gives additional value to it when sought to be condemned.

But much of Mr. Morse's evidence was in reference to the Gunpowder Valley, and was not confined to the Peterson's Run Valley, where this property is situated. The testimony shows that the City of Baltimore already owned the property beyond that of the appellants, and has built a dam across the Gunpowder River. Why compare the Gunpowder Valley with the Patapsco River Valley, the Patuxent River Valley and the others spoken of by Mr. Morse, unless the appellants can control or at least show that they had some definite interest in the Gunpowder Valley which could be valued separately? It may be that the latter valley is very valuable, but the City of Baltimore already owns or controls the Gunpowder Valley, and with that control over it it does not appear that the appellants' property can have any special value for the purposes of a reservoir site. Surely no engineer or any one else will say that a reservoir could be located on the appellants' property for such uses as the City is already making of that valley. The 22 acres of land may be, and doubtless are of some value to the City in connection with the other properties and rights it owns, but it has not been shown or suggested that anyone else had ever thought of that location for such purposes, and it is not what they are worth to the City but what their market value is that we must consider. In affirming the ruling excluding evidence of the adaptability and availability of property for reservoir purposes, much was said in *Matter of Simmons,* 130 N. Y. App. Div. 350, which is appropriate here. It was said: "There is no shadow of evidence of any prior demand for the prop-

erty as a reservoir site, or of any customer who would give more for it for that purpose, or of any circumstance by which the value of the parcel in question, as a part of a natural reservoir site, could be estimated or determined. In the absence of such evidence, it is plain that the appellant has received the benefit of everything which enhanced the value of his property, except the increase caused by the taking of it by the City. The offer was in effect to prove an increase in value due to the selection of the site by the City and the proceeding to acquire it. It did not merely bring up the question of the value of the property taken from the appellant, but that value, plus an increase in the value caused by the proceeding to condemn. As I have already observed, the question was the market value of the property, unaffected by the determination to use it for a reservoir site, and to this question the commissioners rightly confined the evidence." That case was affirmed in 195 N. Y. 573, and also in *McGovern* v. *New York,* 229 U. S. 363. In the latter case the Supreme Court said: "The enhanced value of the land as part of the Ashokan reservoir depends on the whole land necessary being devoted to that use. There are said to have been hundreds of titles to different parcels of that land. If the parcels were not brought together by a taking under eminent domain, the chance of their being united by agreement or purchase in such a way as to be available well might be regarded as too remote and speculative to have any legitimate effect upon the valuation."

In *New York* v. *Sage,* 239 U. S. 61, the Supreme Court again said: "The City is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain."

This case is stronger than those just referred to because it would be practically impossible for the appellants to utilize this site for a reservoir. The City, as we have seen, has already built its dam and owns the property and water rights

below the farm of the appellants. It is true there was some suggestion that a reservoir might be placed there for local purposes, but such suggestion can have no effect in the face of the fact that the water can not be diverted from Peterson's Run without the consent of the City, or at least without in some way acquiring the rights of the City in that water, if that is possible. Mr. Morse in effect admitted as much. He was asked: "Mr. Morse, I will ask you in answer to a suggestion made by his Honor, has this property a value as an independent site for a reservoir?", and replied, "If the reservoir has to be *contained* with (in) the lines of the tract itself, and also if no water can be taken out of the stream at all, why, then it has not but otherwise it would have." He also said, when asked about the Calloway site (referred to in *Calloway* v. *Hubner,* 99 Md. 529), where no water was to be taken from the stream but to be carried to the property and stored: "You could do it, but probably the cost of development for a reasonable amount of water to be stored there would not make it economical to do it. For instance, if you were using it as a distributing reservoir, you probably would construct it at a higher elevation in order that it might serve more portions of Baltimore County by gravity than it would at this point. There is one other thing which would be against putting the reservoir site on that property, and that is you would have to carry the flood waters of Peterson's Run down under the reservoir site. It is probable that the expense—Q. It would not be of very much value? A. It would not be as much value for that purpose alone."

Reduced to its final analysis it seems to us that this record conclusively shows that this property is not available for reservoir purposes excepting in so far as it contributes to those of the condemning party, the City of Baltimore. It will only be a small part of the property used by the City in connection with this water supply, the rest of which it already has, and used simply for some of the water backed up by its dam on the Gunpowder. All that the City really needed was the right to flood this land with the waters

backed upon it. We said in the former opinion in reference to the use of the tract for a reservoir site: "If it affirmatively appeared that the use of the tract in question for such a purpose would necessarily have involved an invasion of the riparian rights of the City, which it has held for many years, there could be no difficulty in eliminating the element of reservoir value from further consideration." It does so appear in this record, and the appellants can not interfere with the flow of the water in Peterson's Run and the possibility of having a reservoir there without using that Run is too speculative and remote to be worthy of serious consideration. It may be well to again quote, as we did on the former appeal, from the opinion of CHIEF JUSTICE RUGG, in *Smith* v. *Commonwealth,* 210 Mass. 259, where he said: "Witnesses and jurors should not be permitted to enter the realm of speculation and swell damages beyond a present cash value under fair conditions of sale by fantastic visions as to future exigencies of growing communities." After saying in the former opinion that the defendant should have had an opportunity to prove, if he could, that the property being condemned had an independent value and marketability as a reservoir site, we added: "If testimony had been allowed to be introduced for that purpose, and had appeared to be merely speculative or otherwise legally insufficient to support the theory upon which it was admitted, it could have been stricken out or withdrawn from the consideration of the jury by suitable instruction." In our judgment the evidence admitted subject to exception and that proffered were of the character described by JUDGE URNER as should be stricken out or withdrawn from the consideration of the jury, and without deeming it necessary to further prolong this opinion by referring to other authorities, or discussing other questions suggested, we are satisfied that the Court was right in its rulings in the second, third and fourth bills of exception.

*Judgment affirmed, the appellants to pay the costs.*